Good morning. Greg Hartman on behalf of the Robertson plaintiffs, and I would like to reserve five minutes for rebuttal. The 2003 Oregon legislature made multiple changes to the existing pension plan for public employees, and this case originally challenged many of those provisions. But by today the case is whittled down to a single issue, the issue that we sometimes refer to as the 6% diversion issue. Throughout the history of Oregon's public employee retirement plan, employees have contributed, in other words, have made a contribution to help fund that plan. And from the inception, the money went into what was identified, not surprisingly, as an employee account. And over time, various specific rights accrued to those benefits, those monies that went into the account. For the plaintiffs who are in front of you, they have the right to a guaranteed rate of return of investment. Did the Strunk case already decide this question on page 1087? Well, the Strunk case, the same issue that we are arguing today was before the Strunk case. The Strunk case decided it as a matter of state law. We are here to decide it as a matter of federal law. It says nothing in the text of the statute requires PIRS members to contribute 6% of their salaries. I'm reading 1087. Why isn't that true here? It's not true here because I believe that the Oregon Supreme Court did not apply an analysis which is consistent with the way the federal courts approach this. What's the difference? The difference is, and I think the best case I can call your attention to, is the Winstar case. Because in Winstar, what the court was doing, it was not a contract case. It was a due process case, but the court makes very clear that they're discussing the unmistakability doctrine which arises in the context of contract cases. And both the plurality opinion and the concurring opinion went through a detailed analysis of the proper way to approach determining, in the context of a statutory contract, whether in fact unmistakability applies in the first place, and if it does, how to apply it in that analysis. And both the plurality as well as the concurring opinion said, essentially, that when a promise is made in a statutory contract, that's what a contract is. It's a promise to do something. And no doctrine, whether it's unmistakability or anything else, requires the court to analyze the words of the statute and find a promise to keep a promise. Again, I think that was one of the artful terms used by Justice Scalia. I think the problem with the Oregon Supreme Court analysis, when we look at it through the federal prism, in other words, through the federal standards that have been applied, is that's exactly what the Oregon Supreme Court was looking for. When they analyze that 6% statute, because a statute is clear. No one contends a statute is not clear. It provides that 6%, this is going to be the contribution, this is where it goes. Legislature simply stepped in and said, no, we're going to put it somewhere else, give it a different label, and therefore certain rights disappear. But I think the fundamental flaw of the Oregon court is, again, they were looking in the statutes, not to find out what was promised, because what was promised was very clear, but to find some additional language, and in that additional language, to find a promise to keep a promise. And under the analysis of Winstar, that simply is not consistent with how the federal courts go about examining statutory contracts. So that's why I think, clearly, this court is not bound to follow the Oregon Supreme Court on this issue. I mean, this is a matter of federal law. But I think more importantly, when you compare that analysis to what I believe is the proper analysis as enunciated in Winstar, I don't think you can follow that analysis. So no, I do not think the Oregon Supreme Court case will play. It does not decide this is a matter of federal law, nor do I think that this court could or should follow that and simply say it's been determined, because I don't think they're applying the correct standard. Going back to what the court did, or what the legislature did, as I said, it was a circumstance where they placed a new label upon this account. Employees still contribute exactly the same amount. They just diverted that 6% into a new account on a whole bunch of issues. I object to the old stuff that was already in the account stays in the account. I object to the word respectively. Okay. And let me phrase it the way I would phrase it. It is unequivocally true that this particular change only applied to benefits to be earned in the future. I agree with that 100%. I do not agree that the term prospectively is the correct term to use, particularly if you're using it like the court did in U.S. Trust. Because in U.S. Trust, which of course was a bond case, the court used the term prospectively in a rather common sense fashion to simply say people who haven't purchased bonds prior to the time the legislation was changed clearly can't come back and claim they have an impairment. But to use the term prospectively in this context assumes that there are no rights and benefits to be approved in the future. Well, let me see if I understand the logic of their argument. Their argument is the money that's already contributed to the individual account stays in the individual account. When people retire, what's been in the individual account is still subject to the money matching option. But it's just from here on out, any additional money doesn't go into the individual account. And that there's no promise ever made that they, that the plan wouldn't change. What's done is done, and that's going to stay put. There's nothing that prevents them from changing what is earned from here on out. Can I respond to that by discussing the Keating case for Administrative Nevada against Keating? Because I think that's the case that has to be the starting point for the analysis of this court, because it's a Ninth Circuit court case, obviously. And I believe, frankly, it is very much on point. But I think there has been some misunderstanding about what Keating did and didn't do because of a misunderstanding about the underlying issue of the Keating case. In Keating, and by the way, we provided the statutes in the appendix to our reply brief, so you could see the statutes themselves. In Keating, the legislature, again, very similar to the state of Oregon, you have a plan which permits employee requires, employee contributions that go into an employee account, and apparently is a kind of default benefit. If you leave the system, you get to get your contributions back. Legislature changed the law. They said from now on, we're not going to have employee contributions as such. We're going to have the employers make all the contributions, but we're also going to lower your salary, a comparable amount to make up for that employer contribution. And those employer contributions, without the new labor on them, will no longer go into the employee account. What was being made in the future, only affecting the future benefits, the change which was being made, which now said there'll no longer be money going into the employee accounts. Keating was all about benefits to be earned by future service. It was not about benefits based on service which had taken place. And the best way I can illustrate that is simply look at the statute because you will find there was no change to the Nevada statute. Individuals still have the unrestricted right to withdraw the monies they had put in when we used to call them employee contributions. What changed is now that we call them employer contributions, no new money based on future service is any longer going to go into those accounts. And that's what Keating found to be unconstitutional. Keating is all about benefits based on future service. And as such, it is just, I don't want to say it's on point, but it is very similar to what happened in the Oregon case. And so I think if you go back and review Keating and look at the underlying statutes and understand what Keating did, in fact, it leads to the result that what the Oregon legislature did in many ways is virtually indistinguishable. So is it your position they can never change the plan once you start? The plan has to be maintained exactly as is. They can't change it. If you start in 1975 and you have Blue Cross Blue Shield, they can't change it to Connecticut General? Another one, we're talking about pension plan. We're not talking about health benefits. We're not talking about salary. But perhaps I can take you back to the words of Keating because Keating addressed this opinion, or excuse me, addressed this issue when it said yes, you can change benefits. There can be what the court calls reasonable changes. But what the court goes on to say, and on my page, if I can find a page reference here, 1227, what the court goes on to say is if there is to be a reasonable change, any disadvantage to employees must be accompanied by comparable new advantages. So not as a pension plan is not set in concrete, but if you're going to change it, at the end of the day, you can't take away what you've promised to the employees. So my answer to you is, I rely on Keating because I think that's the expression of law in this circuit. We don't have that issue here because there's no weighing or balancing here. There's nothing in these changes to let's say the idea that the board promised it would never make a change, and now they approach the benefits. No, Your Honor. Quite frankly, we would not look to the board for that promise, and there's no evidence that they did, and it never happened. Where would you look for the promise? You look to the statute. And just as Keating looked to the statute, and again, if I may call your attention to Keating, when they point out the modern and better reason view recognized that non-vested employees have contractual rights and pension plans. They definitely have some contractual rights. The question is, what are the terms of their contractual rights? I understand that, Your Honor, but I did not see the Keating, and again, you can review the statutes and compare them with the Oregon statutes, but I did not see the Keating court going into the statutory scheme and saying, can we find a promise not to break our promise? What Keating stands for is once a clear statute has been enacted that says this is your pension. I don't think you need a promise not to break your promise, but is there the promise in the first place? But where do you get that? You have to find it in the statute. You have to say the statute should be viewed as a promise that it will not be altered. I think that's what Keating stands for, Your Honor. It says that, and again, I call your attention to the language of the case, which is not dicta, as the district court judge said. I'll take another look at Keating. But what I point out to you, and I look at the cases that Keating relies on, the Washoe County case, going back to the Oregon case, the Taylor against Multnomah County, because what Keating is adopting is the law of unilateral contract. If you go back and track the cases that Keating relies on, it's unilateral contract. And if I may, you recall in law school when we all learned in unilateral contract, if I promise you $50 to cross the Golden Gate Bridge, I can't wait until you're halfway across and change my promise. That unilateral contract concept, I think, is what has to drive the analysis here. That's what Keating decided. Where in the statute or anywhere does it say it has to be 6%? The statute says 6%. I'm sorry? The statute specifically says it has to be 6%? Well, the statute says the contribution is 6%, and the legislature did not change that. It simply took the 6% and put it somewhere else, thereby depriving the plaintiffs here the appellants of a group of rights that I've identified. Thank you very much. May it please the Court, my name is... Hold the mic in front of your mouth, please. May it please the Court, my name is Jeremy Sachs. I represent Governor Kowangoski and the Robertson litigation, and I'll be arguing for appellees this morning. Now, Judge Rhodes got it exactly correct a few minutes ago when he said, hasn't the Strunk litigation resolved this issue?  PERS members have to place the 6% of their salary in the member account post-reform litigation. That's the only issue. And it's true that the Strunk litigation resolved that under the State Impairment Clause and the State Constitution and determined that there was no substantial impairment. Now, Judge Gould was also exactly correct when he said, isn't the real question here what are the terms of the contract? We agree with appellants that PERS is of a contractual nature. There's absolutely no space between us on that issue. The issue, however, is what's in the contract, and that seems to be where we do disagree. Now, the district court went through the proper federal court analysis looking to see whether there's a substantial impairment of the federal contract clause. It looked exactly at the terms of the statute themselves, what was in the statute. It looked at the statute to see if there was a clear and unequivocal expression that was going to bind the government to contractual terms with the PERS members. It also took into account the fact that the contract clause never operates to bar a prospective operating legislative amendment. In other words, the contract clause only steps in and is only applicable if a later legislative enactment operates retrospectively. And we don't believe that the PERS reform litigation operates in that manner for the very reason that Judge Silverman mentioned a few moments ago. There is absolutely nothing in the member accounts that gets taken out of those accounts after the reform legislation takes effect. The accounts are still there. They're still earning interest. They're still earning money for the PERS members. The only difference is that after the reform legislation takes effect, the 6 percent obligation to contribute 6 percent of income goes into a different account. That is the only difference. That is a future benefit for future work that has not yet occurred. That's the other half of the equation that Mr. Hartman seems to be leaving out of his analysis. He was talking about future benefits, but he never actually discussed are those benefits for past work or are they for future work. In his discussion of the Keating case, it's critical to note that the benefits that were being early, monies that had been put into these retirement accounts under the Nevada retirement system, those are benefits based on past work. It was work these individuals had done. They had put their money into these accounts, and at the time they contracted to be members of the system in Nevada, they were told you could take the money out early. The state stepped in and took that benefit away. That is completely different than what's going on regarding the 6 percent issue before the court today. I should also note regarding Keating that the issue before the Keating court is certainly not what is the contract. The Keating court, rather, deferred to the Nevada state court's decision about what the contract was, and the Nevada state court plainly says there's no contest here that both parties agree that there's a contract. Well, both parties before this court today don't agree on what the contractual terms are. And finally, with respect to Keating, I should note, too, that Keating's adoption of Nevada state law in terms of impairment of contracts is not binding on this court. The thing that's important to recall about Keating, I think, is that Keating did exactly what Ninth Circuit courts are supposed to do. They're supposed to defer to the highest state court in the state when the state court is reviewing the terms of a state That's what the Keating court did. And this really goes to the comment that Judge Rhodes made earlier. The state court in Oregon, after the district court made its decision on this very issue, the state court in Oregon, the Supreme Court, reviewed precisely the same statutory amendments, looked at exactly the same amendments that are before the court today. It looked at exactly the same provision that is before the court today. And it determined, looking carefully at the language of the statute, undertaking a statutory analysis that is very close, if not the same, as the Federal Contract Clause analysis. And it determined that there is absolutely no contractual terms in this provision, in the 6 percent provision that give the PERS members a perpetual right to place the 6 percent obligation into the member account. It simply wasn't there. Now, the district court looked at the same provision in this case. The district court's decision, as I said earlier, came out before Strunk. District court ended up in exactly the same place. It said that there is no prospective language, there's no retrospective language, rather, that would affect the rights that were held by the PERS members. For that reason, we believe the district court is correct. So turning to the statutes at issue here, it's clear the language in the statute, in the member account statute, doesn't evince any intent to create a future right for future benefits for future work that hasn't been accomplished yet. And there is no text in the statute saying that the 6 percent issue can never be changed going forward. In that respect, it's quite different than Oregon State cases on this issue that the appellants have raised in their briefing. In the Hughes case, Hughes involved a State provision of the PERS system that said, your PERS benefits can never be taxed now or henceforth. Well, later, the State legislature attempted to change that promise. That was a promise for future benefits based on past work. That's completely different from the situation here. There was text in the statute at the time that the State legislature tried to get around, and it wasn't allowed to do that. Now, the other issue I should address as well is the Winstar case. Now, up until the final reply brief that appellants filed, they seemed to be putting their eggs in the heating and a SPOA basket. Well, then Strunk came out. And after Strunk, it appeared that Winstar was the case, according to the appellants that controlled here. The problem with Winstar, and in Mr. Hartman's telling of Winstar, is that in Winstar, the question, again, before the Court, never was, what is the contract? The question in Winstar was whether the Federal Government, having entered into an express agreement with Savings and Loans, passing legislation that breached that agreement, was then able to use State sovereignty to defend against a breach of contract. Well, that's certainly not the situation before the Court. And because the Court in Winstar never had to determine what the contract was, whatever the question was in Winstar doesn't directly bear on the question here. What does bear in Winstar, however, is the idea of the unmistakability doctrine, which holds that if the government is going to take on new obligations in public contracts, those obligations have to be clear in the terms of the contract. And that's exactly what the Amtrak case, the National Railroad Passenger Corporation case, says, that the terms of the statutory contract have to be clear and unequivocally expressed in the legislation itself. There's no distance between those two pronouncements. And frankly, the Parker Court in the First Circuit made that connection. It understood that there is a connection between the Amtrak case and a connection between the Winstar case on that very issue. But again, the issue is what's the contract? And we believe when you take a look at the rights or the legislation that's before the Court and you look at the specific contractual terms at issue, there simply is no promise that Mr. Hartman seems to find for a perpetual right to put a 6 percent obligation into the member accounts. It isn't there. It's not a question of putting in an extra promise saying I won't break my promise. The question is what's the promise in the first place? That promise is not there. And with that, unless you have any questions, I would conclude. Roberts. Thank you, Mr. Sachs. Thank you, Your Honors. Mr. Hartman, you get the last word today. It's pretty crystal clear to the Court at this point that we start with the fundamental difference about what Keating means and what Keating decided. And so I would call your attention, if I may, to our reply brief, appendix 2, page 4, because it contains a section of the Nevada statute. And the reason we put it there is because Castle has just described Keating as being about money that had been deposited for past work which could no longer be withdrawn. But if you look at the citation we've given you, you'll see that the right to withdraw monies is alive and well as of 1987 in the state of Nevada. That wasn't what Keating was all about. There was no fight because there was no change in the statute on that issue. The change in the state of Nevada was the change for future service, which converted an employee contribution to an employer contribution and took away the right to withdraw those funds for future service. I would suggest to you that under Keating, the district court was wrong. And I would suggest to you that the use of the word prospective, as in this is only a prospective change, if we apply that in this case and we apply it in Keating, then Keating was wrong, they decided. Prospective, retrospective is not the right word. Those are words that come out of the U.S. Trust case. And U.S. Trust tells us nothing about how to analyze a pension contract. It is true that it is our position that when a state makes a promise of a pension, that that is a promise, that the terms and conditions of that, the benefits that are being promised, are entitled to an assumption, and this is what Keating says, that will last a career. And as Keating says, if there is to be a change in that plan, there must be compensating advantages and disadvantages. This is right out of Keating. Nothing says the state can't change the plan for new hires. That truly would be prospective. I think Keating got it right, the district court got it wrong, and Keating is very much in the mainstream of cases. Keating is not an outlier. As the court itself said, this is the better reasoned modern view of pensions. And I would ask the court to study Keating, and I think, as I said, I think Keating got it right, and a straightforward application of Keating to this case requires that the appellants would prevail. Thank you very much. Thank you. Mr. Sachs, thank you as well. The case just argued and very well argued is submitted. We'll stand adjourned for this session. Thank you.
judges: Silverman , Gould, Rhoades